## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| KYLE R. DORNAN, | ) | CASE NO. 1:22-CV-02244-JRA |
| Plaintiff, | ) | |
| | ) | U.S. DISTRICT JUDGE |
| | ) | JOHN R. ADAMS |
| v. | ) | |
| | ) | U.S. MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

### I.  INTRODUCTION

Plaintiff Kyle R. Dornan ("Mr. Dornan") seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). U.S. District Judge John R. Adams has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

### II.  PROCEDURAL HISTORY

Mr. Dornan filed applications for DIB and SSI on December 17, 2020, alleging a disability onset date of April 10, 2019. (Tr. 247-60.)[1] His applications were denied initially and upon reconsideration. (Tr. 130-33, 135-38, 141-42, 144-47.) On October 26, 2021, an ALJ held a telephonic hearing due to the COVID-19 pandemic where Mr. Dornan, represented by counsel,

---

[1] The administrative transcript ("Tr.") appears at ECF No. 6.

1

and a vocational expert ("VE") testified. (Tr. 36-83.) The ALJ issued a written decision on January

12, 2022, finding that Mr. Dornan was not disabled under the Social Security Act. (Tr. 19-30.) The

ALJ's decision became final on October 14, 2022, when the Appeal council declined further

review. (Tr. 5-10.) On December 14, 2022, Mr. Dornan filed a Complaint, challenging the

Commissioner's final decision. (ECF No. 1.) He raises the following assignments of error:

> (1) The ALJ erred when she failed to find that the opinions of the treating and
> reviewing sources were consistent with and supported by the medical evidence
> and failed to incorporate the stated limitations into her RFC.

> (2) The ALJ committed harmful error when she failed to properly apply the criteria
> of Social Security Ruling 16-3p and failed to find that the intensity, persistence,
> and limiting effects of Plaintiff's symptoms precluded him from engaging in
> substantial gainful activity on a full-time and sustained basis.

(ECF No. 7, PageID#562.)

### III.   BACKGROUND INFORMATION

#### A.   Personal, Educational, and Vocational Experience

Mr. Dornan was born in 1983, and he was 36 years old on the alleged disability onset date.

(Tr. 29.) He lives alone and receives Medicaid and food stamps benefits. (Tr. 43.) He has a driver's

license. (*Id.*) He has an associate's degree in business. (Tr. 45.) Since his alleged disability onset

date, Mr. Dornan worked part-time in 2019 and 2020. (Tr. 46.) His past relevant work was

employment as an estimator, membership solicitor, and sales representative. (Tr. 28.)

#### B.   Relevant Statements and Hearing Testimony

##### 1.   Mr. Dornan's Function Report

In January 2021, Mr. Dornan completed an Adult Function Report. (Tr. 285-93.) He stated

he lives alone and takes care of his dog with his mother's assistance. (Tr. 285-86.) He testified that

his conditions limit his ability to work due to consistently waking up after little sleep and then

experiencing panic attacks where he thinks about what he needs to complete for the day and how

2

things might go wrong. (Tr. 285*.*) He further stated that his OCD, anxiety, and depression have "killed [his] motivation and things [he] want[s] to do in life at this time." (*Id.*) He reported he does not find joy in things he does. (*Id.*)

He stated that he leaves his house to let his dog out, goes to doctors' appointments, and does things with his mother, but he also testified that he usually does not have the desire or mental strength to go out alone. (Tr. 286, 288.) He stated that he completes his shopping by phone once a week. (Tr. 288.) He reported that he does not pay bills, and his mother assists with this task. (*Id.*) He stated that "numbers and OCD do not work well together," and this impacts his ability to handle money. (*Id.*)

With respect to his social activities, Mr. Dornan reported spending time with others in person and on the phone. (Tr. 289.) Although Mr. Dornan stated he gets agitated easily and is less social than before his symptoms began, he also reported that he occasionally goes out to eat or for coffee and tries to go to church at least once a month. (*Id.*) Mr. Dornan further reported difficulty maintaining concentration, following instructions, and handling stress or changes in his routine, but he did not report any difficulty with his memory, completing tasks, understanding, or getting along with others. (Tr. 290-91.) He reported that he has no difficulty getting along with authority figures and has never been fired from a job for failing to get along with others. (Tr. 290.) He stated that he has an unusual fear that he is "going to do something wrong and mess up everything" daily. (Tr. 291.)

### 2. Mr. Dornan's Hearing Testimony

Mr. Dornan testified that he has a driver's license, but he does not drive frequently due to his anxiety. (Tr. 43.) He stated that lately he has "been staying more inside and kind of socially distant." (Tr. 44.) He can drive to run errands as needed. (*Id.*) He attends his psychiatric

3

appointments through video conferencing. (*Id.*) He has tried to get his mother to go with him to other appointments. (Tr. 44-45.)

Mr. Dornan stated that his alleged onset date was April 2019, the date that he moved back to Ohio to be closer to his family. (Tr. 50-51.) He testified that he has been unable to work since April 2019 because of his OCD, anxiety, and depression. (Tr. 59.) After he relocated, he said that his medications stopped working and he received no benefit from trials of other medications. (Tr. 59-60.) As a result, he felt "[e]verything just kind of shut[ting] down" for him and his motivation going "down the drain." (Tr. 60.) He stated that he went to rehab for five days in February 2020 because he was mixing alcohol and Xanax, not because he was drinking too much. (Tr. 60-61.) He testified that he tried various medications after rehab, which were not helpful or caused side effects such as sleep issues. (Tr. 61-62, 73.) He no longer uses Xanax, but he continues to drink socially with his neighbors. (Tr. 63.)

Mr. Dornan typically spends close to 16 hours in bed due to lack of motivation and fatigue, but he also stated that he gets up to let his dog out. (Tr. 67, 70.) He also stated that he spends time at the neighborhood pool and goes to a friend's house for cookouts and to watch sports. (Tr. 64.) He reported that he cooks once or twice a week and does laundry once a month, but he hires someone to clean his house. (Tr. 68.) He testified that he goes to the grocery store every two weeks with some assistance from his mother. (Tr. 44.) He stated that he usually cannot concentrate or focus for very long. (Tr. 71.) He watches episodes of shows that he watched in the past and plays on his phone. (*Id.*) Due to his OCD, he is testified that he is obsessive about locking the front door to his house, turning the stove off, locking his car doors, shutting his truck doors, and looking online. (Tr. 72.) He stated that the side effects from his medication are fatigue, nausea, headaches, diarrhea, and dry mouth. (*Id.*)

4

### 3. *Vocational Expert's Testimony*

The ALJ first asked the VE whether an individual with Mr. Dornan's age, education, and work experience could perform work with no exertional limitations, except he can work in an environment free of fast-paced production requirements or strict production quotas, which setting is relatively static, in that the job demands are routine and predictable in nature; and should perform no work tasks that involve customer service duties, confrontation, collaboration, conflict resolution, directing the work of others, persuading or influencing others, or being responsible for the safety or welfare of others. (Tr. 79.) The VE opined that this individual could perform work as a cleaner II, industrial cleaner, and hospital cleaner. (Tr. 79-80.)

The ALJ then asked whether the hypothetical individual with the same limitations from the first hypothetical except further limited to the light exertional level could perform work. (Tr. 80.) The VE opined that this individual could perform work as a merchandise marker, housekeeping cleaner, and officer helper. (Tr. 80-81.) The ALJ also asked the VE whether her answer would change if this same individual were instead limited to performing simple, routine tasks. (Tr. 81.) The VE opined that the same jobs would still exist for this individual. (*Id.*)

The VE stated that off-task behavior, excluding regularly scheduled breaks and lunches, that exceeds 15 percent or more of the workday would be work-preclusive. (Tr. 81.) The typical breaks permitted would be two 15-minute breaks and one 30-minute lunch. (*Id.*) Any other additional breaks required daily or even one time weekly on a regular or ongoing basis would be work-preclusive. Regarding absenteeism, the VE opined that an employer might tolerate one absence per month, *i.e.,* approximately eight times over the course of a work year. (*Id.*)

### C.  **Relevant Non-Medical/Medical Opinion Evidence**

#### 1.  *State Agency Psychological Consultants*

In February 2021, Irma Johnston, Psy.D., reviewed the record at the initial level of consideration. Dr. Johnston opined that Mr. Dornan could sustain concentration and persistence to carry out simple tasks in settings where there is no demand for a fast pace; relate with supervisors and coworkers on a superficial basis; and work in relatively static environments where job demands are routine and predictable in nature. (Tr. 94-96, 102-04.) In June 2021, Aracelis Rivera, Psy.D., assessed the same limitations. (Tr. 112-13, 120-21.)

#### 2.  *Kelly Montgomery, A.P.R.N., C.N.P.*

In September 2021, Nurse Montgomery completed a Mental Impairment Questionnaire. (Tr. 484-85.) Nurse Montgomery indicated that she treated Mr. Dornan on four occasions since July 28, 2021.[2] Nurse Montgomery described Mr. Dornan's clinical findings as severe depression and severe OCD. (Tr. 484.) Nurse Montgomery stated that side effects of his medications are fatigue, nausea, headache, insomnia, drowsiness, dizziness, diarrhea, and dry mouth. (*Id.*) Nurse Montgomery stated that Mr. Dornan's conditions "will be chronic and ongoing." (*Id.*)

In a series of checkboxes, Nurse Montgomery rated the severity of Mr. Dornan's mental limitations. (Tr. 484-85.) Regarding Mr. Dornan's sustained concentration and persistence limitations, Nurse Montgomery opined that Mr. Dornan was unable to meet competitive standards[3] with his abilities to carry out very short and simple instructions; carry out detailed instructions, maintain attention and concentration for extended periods; perform activities within a schedule, manage regular attendance and be punctual within customary tolerances; sustain an ordinary

---

[2] There are no treatment notes in the record for any of these visits.
[3] The form defines "unable to meet competitive standards" as the patient "cannot satisfactorily perform this activity independently, appropriately, effectively[,] and on a sustained basis in a regular work setting." (Tr. 484.)

routine without special supervision; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically-based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 484.)

With respect to Mr. Dornan's understanding and memory limitations, Nurse Montgomery opined that Mr. Dornan had limited but satisfactory limitations in his abilities to remember locations and work-like procedures and understand and remember very short and simple instructions, but he was unable to meet competitive standards in his ability to understand and remember detailed instructions. (Tr. 485.)

Regarding Mr. Dornan's social interaction limitations, Nurse Montgomery opined that Mr. Dornan was unable to meet competitive standards in his abilities to interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (*Id.*)

With respect to Mr. Dornan's adaptation limitations, Nurse Montgomery indicated that Mr. Dornan was unable to meet competitive standards in his abilities to respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; and set realistic goals or make plans independently of others. (*Id.*)

Finally, Nurse Montgomery opined that Mr. Dornan is "unable to work/behind work due to listed conditions." (*Id.*)

### D.  <u>Relevant Medical Evidence</u>

On May 8, 2019, Mr. Dornan attended a follow-up appointment with his primary care provider, Timothy Miller, M.D., for complaints of anxiety after relocating and starting a new job. (Tr. 399.) Dr. Miller continued Mr. Dornan on an anti-depressant and began tapering him off Xanax. (*Id.*)

On June 3, 2019, Mr. Dornan presented to the emergency department with persistent nausea and upper abdominal discomfort. (Tr. 396.) He reported experiencing depression and anxiety but denied suicidal or homicidal ideation. (*Id.*) His mental status examination findings showed he had normal mood, affect, behavior, judgment, and thought content. (Tr. 396-98.)

On August 29, 2019, Aasia Syed, M.D, a psychiatrist, saw Mr. Dornan for a new patient visit for complaints of anxiety and panic attacks. (Tr. 341-46.) Mr. Dornan described his interests and hobbies as hanging out with friends and socializing around the swimming pool. (Tr. 341.) He reported drinking alcohol four days per week. (Tr. 343.) Dr. Syed indicated that Mr. Dornan was dressed appropriately with good hygiene. (Tr. 344.) Mr. Dornan's mental status examination revealed an anxious and depressed mood and constricted affect, but with good eye contact, normal speech, linear and goal-directed thought processes, intact memory, fair fund of knowledge, and fair insight/judgment. (*Id.*) Dr. Syed assessed Mr. Dornan with severe recurrent major depressive disorder without psychotic features, generalized anxiety disorder, panic disorder, obsessive compulsive disorder, and moderate alcohol use disorder. (Tr. 345.)  Dr. Syed prescribed medications and advised Mr. Dornan to taper off Xanax completely. (*Id.*)

On October 3, 2019, Dr. Syed adjusted Mr. Dornan's medications after he reported no benefit from his medication regimen. (Tr. 346, 349.) Mr. Dornan's mental status examination

remained the same, except that Dr. Syed also noted that Mr. Dornan had a cooperative attitude, no suicidal ideation, and fair attention/concentration. (Tr. 348-49.)

On October 17, 2019, Mr. Dornan reported that he was doing well overall and had cut down on his Xanax use and alcohol use "tremendously." (Tr. 350.) His mental status examination findings were unchanged. (Tr. 351.) Dr. Syed increased the dosage of Mr. Dornan's anti-depressant medication. (*Id.*) Two days later, Mr. Dornan reported that he was doing somewhat better overall. (Tr. 352.) Despite describing his mood as "pretty crappy" and reporting that his medications were ineffective, Mr. Dornan indicated that Xanax was helping his anxiety and panic attacks. (*Id.*) His mental status examinations were unchanged, although Dr. Syed noted mild self-neglect and a polite attitude. (Tr. 353.) Dr. Syed changed Mr. Dornan's medications and continued to taper him off Xanax. (Tr. 353-54.)

On November 1, 2019, Mr. Dornan saw Jennifer Cuffaro, L.P.C.C, for an intake mental status examination. (Tr. 510-14.) He described his weaknesses as lacking motivation, procrastinating, and "starting and sticking with things." (Tr. 511.) Ms. Cuffaro recommended that Mr. Dornan participate in weekly counseling; however, Mr. Dornan subsequently participated in only one session and cancelled multiple sessions. (Tr. 511-12, 515-19.)

On November 21, 2019, Timothy Miller, M.D., noted that Mr. Dornan's depression and anxiety were not controlled. (Tr. 391.) Dr. Miller observed that Mr. Dornan was positive for depression and appeared nervous/anxious. (*Id.*)

On November 25, 2019, Mr. Dornan reported little response to his medication change. (Tr. 355.) Mr. Dornan's mental status examination indicated that Mr. Dornan had depressed and anxious mood with constricted affect, but otherwise had linear and goal-directed thought process, forward-thinking thought content, intact memory, fair attention and concentration, fair fund of

9

knowledge, fair judgment and insight, and no suicidal and homicidal ideation. (Tr. 356-57.) Dr. Syed no longer noted signs of mild self-neglect. (Tr. 355-56.)

On January 10, 2020, Mr. Dornan returned to Dr. Syed, reporting that his medications were not helping and he had decided to discontinue one of his medications, Wellbutrin, due to side effects. (Tr. 357.) Dr. Syed described Mr. Dornan as irritable, but otherwise noted no changes in his mental status. (Tr. 361.) Dr. Syed adjusted Mr. Dornan's medications. (*Id.*)

On February 10, 2020, Dr. Syed noted Mr. Dornan had been drinking five to eight cans of beer per day and reported being in severe distress after suddenly stopping his alcohol consumption two days earlier. (Tr. 363.) Mr. Dornan reported that he previously attributed his anxiety to his medications, but he now believed his anxiety was due to drinking alcohol excessively. (*Id.*) Other than an anxious and confused mood, Mr. Dornan's mental status examination findings remained unchanged. (Tr. 364-65.) Dr. Syed adjusted Mr. Dornan's medications and sent him to the emergency room. (Tr. 365.) Mr. Dornan was in an alcohol detoxification unit for five days. (Tr. 367.)

On January 6, 2021, Mr. Dornan attended a follow-up appointment with Ms. Cuffaro. Mr. Dornan reported that he felt like garbage, had no motivation, and did not know what he wanted to do for work. (Tr. 430-35.) His mental status examination noted severe depressed mood, mild appetite disturbance, moderate sleep disturbance, moderate psychomotor/retardation, moderate poor concentration, moderate agitation, severe anxiety/panic, ad severe obsessions or compulsions. (Tr. 432.) He described his weaknesses as: "not trying"; "making up excuses"; "could be trying harder"; and "weak physically." (Tr. 432.) Ms. Cuffaro again recommended weekly counseling. (Tr. 432-33.) Mr. Dornan subsequently participated in two counseling sessions through March

2021 during which he discussed some ongoing symptoms, as well as his desire to "start working consistently." (Tr. 526-31.)

On January 20, 2021, Mr. Dornan met with Sanjay Parikh, M.D., a neurologist, for evaluation of his anxiety, depression, and attention deficits. (Tr. 441-44.) Mr. Dornan reported issues completing his day-to-day work. (Tr. 441.) Dr. Parikh observed that Mr. Dornan demonstrated interactive and cooperative behavior, an appropriate affect, intact recent and remote memory, normal attention and concentration, normal comprehension, and adequate fund of knowledge. (Tr. 443-44.) Dr. Parikh prescribed medication and discussed behavior medication. (Tr. 441.)

## IV.    THE ALJ'S DECISION

The ALJ first determined that Ms. Dornan met the insured status requirements of the Social Security Act through September 30, 2024. (Tr. 21.) The ALJ then determined Mr. Dornan has not engaged in substantial gainful activity since April 10, 2019, the alleged disability onset date. (Tr. 21-22.) The ALJ found that Mr. Dornan had the following severe impairments: major depressive disorder, generalized anxiety disorder, panic disorder, alcohol use disorder, and attention deficit-hyperactivity disorder. (Tr. 22.) However, the ALJ found that none of these impairments—individually or in combination—met or medically equaled the severity of a listed impairment in 20 CR Part 404, Subpart P, Appendix 1. (Tr. 22-24.)

The ALJ determined that Ms. Dornan could perform work at the medium exertional level, except that he is limited to the performance of work tasks conducted in a setting free of fast-paced production requirements or strict production quotas. (Tr. 24-28.) This setting would be relatively static, in that job demands would be routine and predicable and nature and would not impose tasks involving customer service, duties, confrontation, collaboration, conflict resolution, the direction

11

of, persuasion of, or responsibility for the safety and welfare of others. (*Id.*) The ALJ next determined that Mr. Dornan is unable to perform any past relevant work. (Tr. 28-29.) The ALJ further determined that transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that Mr. Dornan is not disabled. (Tr. 29-30.) Considering Mr. Dornan's age, education, work experience, and residual functional capacity, the ALJ determined there are jobs that exist in significant numbers in the national economy that Mr. Dornan could perform, such as employment as a cleaner II, industrial cleaner, and hospital cleaner. (Tr. 29-30.) Accordingly, the ALJ concluded that Mr. Dornan was not disabled within the meaning of the Social Security Act since her application filing date. (Tr. 30.)

## V.     LAW & ANALYSIS

### A.     <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a

reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B.  Standard for Disability

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the

national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id*.

**C.  Analysis**

### 1.  *Substantial Evidence Supports the ALJ's Evaluation of the Opinion Evidence*

Ms. Dornan argues that the ALJ erred in evaluating the opinion of Nurse Montgomery. (ECF No. 7, PageID#562, 569-74.) Specifically, he contends that the ALJ failed to adequately explain her findings regarding the supportability, consistency, and persuasiveness of Nurse Montgomery's opinion and failed to address contradictory evidence establishing supportability and consistency. (*Id.* at PageID#573-74.) The Commissioner disagrees. (ECF No. 10, PageID#590-94.) For the following reasons, Mr. Dornan's arguments lack merit.

At Step Four of the sequential evaluation, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how she considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2).

According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This

14

is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. *See* 20 C.F.R. § 404.1520(c)(1)-(2).

> The ALJ assessed Nurse Montgomery's opinion as follows:

> Kelly Montgomery, CNP, a treatment provider, indicated, on September 15, 2021, that the claimant would have marked limitations in his ability to concentrate, persist and remain pace, mild-to-marked limitations in his ability to understand, remember and carry out instructions, marked limitations in his ability to interact with others, and marked limitations in his ability to adapt and manage himself. She also indicated that the claimant could not work or begin work. Ms. Montgomery has treated the claimant for thirty minutes at the time of the issuance of this opinion (8F/1). She is reporting within the bounds of her professional certifications. However, relevant to her assessment of the four, psychologically-based, work-related areas of ability, she is overstating the claimant's limitations to significant degree, by comparison to the overall evidence of record, described in digest form in the preceding paragraph. This portion of her opinion is not persuasive. Relevant to the conclusory statement that the claimant could not work or begin work, this opinion is among those that are now, by regulatory definition, neither valuable, nor persuasive.

(Tr. 27-28.)

Here, the ALJ addressed the consistency of Nurse Montgomery's opinions. Specifically, the ALJ noted that Nurse Montgomery "overstat[es] the claimant's limitations to significant degree, by comparison to the overall evidence of record, described in digest form in the preceding paragraph." (Tr. 28.) The ALJ discussed those findings earlier when assessing the persuasiveness of the state agency opinions. *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 455 (6th Cir. 2016) ("[T]he ALJ's conclusion was sufficiently supported by factual findings elsewhere in the decision that need not be repeated…."); *see Jackson v. Comm'r of Soc. Sec.*, No. 1:22-CV-01789, 2023 WL 7408090, at *2 (N.D. Ohio Nov. 9, 2023). Specifically, the ALJ stated:

> The state agency psychological consultants, Irma Johnston, Psy.D., and Aracelis Rivera, Psy.D., each indicated that the claimant would be able to perform simple

tasks with no fast pace, involving only superficial interaction with others, in a static setting, where demands would be routine and predictable. Each of these doctors had the opportunity to review the evidence of record, to which each cited liberally in support of their conclusions and each is well versed in the terminology and analytical framework employed in the disposition of these claims. The record shows a claimant abusing alcohol, complicated by depression and anxiety. These would be expected to, and the claimant reports does (3E/8), interfere with attention and concentration at least episodically. However, the claimant holds an Associate's Degree (1F/4) with a fair to adequate fund of knowledge (1F/5), (5F/4), intact memory function (1F/5, 26), (5F/3), fair-to-normal attention and concentration (1F/9, 26), (5F/3), driving linear, goal-directed, logical associations and thought process (1F/5, 18, 25-26). If restricted to the performance of work tasks in a setting free of anxiety- or frustration-inducing production pressures, where job tasks would be routine and predictable, the claimant appears to have retained sufficient, residual, cognitive function to serve as "backstop" against these periodic deficits from becoming fatal to competitive work. The claimant has described becoming agitated more easily and being less social than in past years. However, he is discernibly able to function in public settings, such as restaurants, coffee shops and church (3E/7). He has friends, socializes by a swimming pool (1F/2), and is regularly described in the record in pro-social terms (1F/9, 25), (5F/3). If the potential for escalation in the intensity of his interaction with others is controlled, he appears to have retained sufficient, residual, social function to engage in competitive work. The claimant describes a poor reaction to stressors and changes. However, treatment notes describe him as exhibiting fair (1F/5, 18, 26)-to-normal (2F/18-19) insight and judgment. His mental status examinations remained stable (1F/5) compare with (5F/3), despite changes and stressors including the maintenance of subterfuge, in combination with this mother, to make his stepfather believe he is working (1F/2, 24), the discovery of his alcoholism, hospitalization for detoxification, and discovery that he would no longer be prescribed benzodiazepines (1F/28). If restricted to the performance of tasks conducted free of anxiety- or frustration-inducing production pressures, where he could rely on work tasks remaining routine and predictable in nature, he appears to have retained sufficient, residual, adaptive function to engage in competitive work. These opinions overstate the claimant's cognitive limitations to considerable degree, but remain broadly consistent with, and supported by, the evidence of record and so remain persuasive.

(Tr. 27.)

Regarding consistency, as reproduced above, the ALJ pointed to ample substantial evidence in demonstrating why Nurse Montgomery's opinion was not consistent with the record. For example, regarding Mr. Dornan's limitations in sustaining concentration and pace, the ALJ noted that Mr. Dornan's depression, anxiety, and alcohol consumption interfered with his attention

16

and concentration at least episodically, yet his mental status examinations showed fair to adequate fund of knowledge, fair to normal attention and concentration, intact memory, and linear and goal-directed thought processes. (Tr. 27; *see* Tr. 344, 347, 364-65, 443-44; *see also* Tr. 23.)

With respect to Mr. Dornan's social interactions, the ALJ also demonstrated why Nurse Montgomery's opined limitations were not consistent. Indeed, the ALJ observed that Mr. Dornan is "discernibly able to function in public settings." (Tr. 27.) The ALJ pointed to Mr. Dornan's own reports that he goes to restaurants, coffee shops, and church; has friends; socializes by a swimming pool; and is regularly described in the treatment notes in pro-social terms. (Tr. 27; *see* Tr. 289, 341, 344, 348, 356, 364, 443.)

And regarding Mr. Dornan's adaptation limitations, the ALJ acknowledged that Mr. Dornan reports a poor reaction to stressors and changes, but the record described him as having fair to normal insight and judgment. (Tr. 27; *see* Tr. 344, 357, 365, 397-98.) The ALJ further indicated that Mr. Dornan's mental status examinations remained stable, despite changes and stressors including the "maintenance of subterfuge, in combination with his mother, to make his stepfather believe he is working;" the discovery of his alcoholism and need for inpatient detoxification; and the discovery that he would no longer be prescribed benzodiazepines. (Tr. 27; *see* Tr. 341, 344, 363, 367; *cf.* Tr. 443.) Based on review of this evidence, the ALJ provides ample evidence demonstrating why Nurse Montgomery's extreme opined limitations were not consistent with the overall record.

Though the ALJ did not address the supportability of Nurse Montgomery's opinion, this is harmless error because this opinion is merely a mere checkbox form that lacks any meaningful explanation in support of its conclusions. Moreover, the checkbox form fails to reference or incorporate Nurse Montgomery's records and objective findings to permit a reviewing party to

provide a more thorough assessment of the opinion. In *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456 (6th Cir. 2015), the Sixth Circuit re-stated a rule that applies when an ALJ fails to provide good reasons for rejecting the opinion of a treating source. First, *Hall* observed that the Sixth Circuit had "not yet defined the scope of the harmless error inquiry" in these situations, other than to say that harmless error cannot mean only that the clamant has little chance of success. *Id.* at 462. However, *Hall* then noted that the Sixth Circuit had previously identified certain circumstances that "may not warrant reversal" if an ALJ does not provide good reasons. *Id.* (citation omitted). Significantly, first among these circumstances is "if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it." (*Id.*).

Notably, the Sixth Circuit has held that a checkbox opinion without explanation is "patently deficient." *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 475 (6th Cir. 2016) (finding that these types of opinions are "'weak evidence at best' and meets [the Sixth Circuit's] patently deficient standard") (citation omitted). Even when the ALJ does not "expressly cite the unsupported checkbox form as a basis" for rejecting an opinion, a checkbox form may be inherently deficient. *Gallagher v. Berryhill*, No. 5:16-cv-01831, 2017 WL 2791106, at *9 (N.D. Ohio June 12, 2017) (citing *Hernandez*), *report and recommendation adopted*, 2017 WL 2791106 (N.D. Ohio June 27, 2017); *see Hunt v. Comm'r of Soc. Sec.*, No. 1:21-CV-00075-DAR, 2022 WL 4599246, at *3 (N.D. Ohio Sept. 29, 2022) (finding checkbox opinion was inherently deficient even when ALJ did not cite checkbox form as basis); *Marks v. Comm'r of Soc. Sec.*, No. 1:16-cv-02848, 2018 WL 1801609, at *8 (N.D. Ohio Jan. 12, 2018) (finding checkbox opinion "even when the ALJ did not specifically call attention to it in the decision").

Here, Nurse Montgomery's opinion consists of a series of checkboxes where she indicates the severity of Mr. Dornan's limitations. (*See generally* Tr. 485.) Reading this opinion very

liberally, Nurse Montgomery's only explanations were Mr. Dornan's diagnoses, prescribed medications and their side effects, and her statement that he has "severe depression [and] severe obsessive compulsive disorder," and that his "conditions will be chronic and ongoing." (*Id.*) These limited explanations do not convert the checkbox form-nature of Nurse Montgomery's opinion. *See Duke v. Comm'r of Soc. Sec.*, No. 21-CV-29, 2022 WL 1075171, at *4 (N.D. Ohio Apr. 11, 2022) (finding that medical opinion with blanks fields provided some description beyond a mere checkbox form but patently deficient because the form itself did not explain the claimant's limitations); *Toll v. Comm'r of Soc. Sec.*, No. 1:16cv705, 2017 WL 1017821, at *4 (W.D. Mich. Mar. 16, 2017) (finding ALJ articulation error harmless where the opinion consisted of a checkbox worksheet lacking any explanation beyond a diagnosis).

Nurse Montgomery's opinion fails to point to any treatment notes in support and fails to explain her rationale for any of her opined limitations. (*See* Tr. 484-85.) Because Nurse Montgomery's opinion is patently deficient, Mr. Dornan's argument that the ALJ erred in her articulation of the persuasiveness of Nurse Montgomery's opinion is without merit. *Carter v. Comm'r of Soc. Sec.*, No. 5:22-CV-00367, 2023 WL 1430470, at *3-5 (N.D. Ohio Jan. 31, 2023) (finding failure to comply with regulations' articulation requirements excused because checkbox medical opinion was "patently deficient").

Next, the ALJ properly determined that Nurse Montgomery's statements regarding Mr. Dornan's inability to work was neither valuable nor persuasive under the Social Security regulations. (Tr. 28.) Here, Nurse Montgomery opined that Mr. Dornan was "unable to work/begin work due to listed conditions." (Tr. 485.) An ALJ may generally give little deference to such an opinion because it deals with an issue reserved for the Commissioner. *See Quisenberry v. Comm'r of Soc. Sec.*, 757 F. App'x 422, 431 (6th Cir. 2018) ("Indeed, 20 C.F.R. § 404.1527(d)(1) and (3)

19

now provide explicitly that no special significance will be given to the source of an opinion such as whether a claimant is disabled or unable to work reserved to the Commissioner of Social Security."); *Kestel v. Comm'r of Soc. Sec.*, 756 F. App'x 593, 600 (6th Cir. 2018) ("[F]inal responsibility for deciding a claimant's ability to work is an issue reserved to the commissioner, and thus Dr. Ward's opinion regarding Kestel's perceived inability to work is not entitled to any controlling weight.") (citations omitted).

Finally, Mr. Dornan challenges the ALJ's evaluation by reciting evidence to attempt to demonstrate that Nurse Montgomery's opinion is supported by and consistent with the record. This argument is "essentially asking this Court to reweigh the evidence and issue a *de novo* determination." *Vidot v. Colvin*, No. 1:14 CV 1343, 2015 WL 3824360, at *8 (N.D. Ohio June 18, 2015). This the Court cannot do. Pointing to evidence demonstrating another feasible interpretation does not establish the ALJ's decision is not supported by substantial evidence. "Even if the evidence could also support another conclusion, the decision of the [ALJ] must stand if the evidence could reasonably support the conclusion." *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). The Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)). Mr. Dornan does not establish that the ALJ's decision is not supported by substantial evidence.

Although unclear, Mr. Dornan asserts an additional, inconsistent argument involving the ALJ's analysis of the state agency findings. First, Mr. Dornan argues that the ALJ erred by failing to include all the limitations from the state agency findings in her hypothetical question and RFC determination. (ECF No. 7, PageID#571-73.) Then, however, he alleges it is unclear whether the ALJ included these limitations. (*Id.* at PageID#573.) Both arguments lack merit.

In February 2021, Dr. Johnston opined that Mr. Dornan could sustain concentration and persistence to carry out simple tasks in settings where there is no demand for a fast pace; relate with supervisors and coworkers on superficial basis; and work in relatively static environments where job demands are routine and predictable in nature. (Tr. 94-96, 102-04.) In June 2021, Dr. Rivera assessed these same limitations. (Tr. 112-13, 120-21.)

As reproduced above, the ALJ found that these state agency findings overstated Mr. Dornan's cognitive functioning to a considerable degree (Tr. 27), and thus, found no basis for including a limitation to simple tasks. In support of this conclusion, the ALJ noted that Mr. Dornan earned an associate degree, and examination findings show he demonstrated fair to adequate fund of knowledge, intact memory function, and fair to normal attention and concentration. (Tr. 27; *see* Tr. 343-44, 357, 3665, 396, 443-44.)

The ALJ, however, found that the remainder of the state agency opined limitations were "broadly consistent with, and supported by, the evidence of record and so remain persuasive." (Tr. 27.) Reading the decision as a whole and with common sense, these limitations are consistent with the limitations the ALJ included in her RFC determination. *See Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) (observing that the ALJ's rationale need not come in "tidy packaging" and that courts must "read the decision as a whole and with common sense"). The ALJ addresses Mr. Dornan's concentration, persistence, and adaptation by including a limitation to work tasks conducted in a setting free of fast-paced production requirements, as well as an additional limitation to no strict production quotas. (Tr. 24; *see also* Tr. 27 ("If restricted to the performance of work tasks in a setting free of anxiety-inducing or frustration-inducing production pressures, where job tasks would be routine and predictable, the claimant appears to have retained sufficient, residual, cognitive function to serve as "backstop" against these periodic

21

deficits from becoming fatal to competitive work.")) The ALJ also included a limitation to work in a setting that was relatively static in that the job demands would be routine and predictable in nature. (Tr. 24; *see also* Tr. 27.)

Regarding Mr. Dornan's social limitations, the ALJ did not include the state agency limitation that Mr. Dornan could relate with supervisors and coworkers on a "superficial basis," but nonetheless limited Mr. Dornan to a setting that "does not impose tasks involving customer service duties, confrontation, collaboration, conflict resolution, the direction of, persuasion of, or responsibility for the safety and welfare of others." (Tr. 24; *see also* Tr. 27 ("If the potential for escalation in the intensity of his interaction with others is controlled, he appears to have retained sufficient, residual, social function to engage in competitive work.")) Wholly absent from Mr. Dornan's argument is *how* the ALJ did not adequately account for his social limitations. Substantial evidence supports the evaluation of the state agency opinions.

In sum, Mr. Dornan establishes no error in the case law or lack of substantial evidence supporting the ALJ's decision. Regarding Nurse Montgomery's opinion, the ALJ properly discussed the consistency of the opinion. Although the ALJ did not articulate the supportability of the opinion, this is harmless error because Nurse Montgomery's opinion is a patently deficient checkbox form. Moreover, Nurse Montgomery's opinion improperly opined on Mr. Dornan's inability to work, an issue reserved to the Commissioner. Finally, Mr. Dornan does not establish that the ALJ erred in analyzing the state agency opinions or incorporating the opined limitations. Accordingly, I recommend that the Court reject this assignment of error because it lacks merit.

### 2. *Substantial Evidence Supports the ALJ's SSR 16-3p Evaluation.*

Mr. Dornan argues that the ALJ did not comply with SSR 16-3p when assessing his subjective mental health symptoms. (ECF No. 7, PageID#576-78.) Specifically, he contends that

the ALJ unreasonably found that the intensity, persistence, and limiting effects of his symptoms were not disabling, and that the ALJ "ignored and/or disregarded" evidence that they were disabling. (*Id.* at PageID#574-78.) The Commissioner replies that the ALJ complied with SSR 16-3p, and that substantial evidence supports the ALJ's assessment of his subjective symptoms. (ECF No. 10, PageID#594-98.) Ms. Dornan's arguments are not well-taken because they overlook the entire analysis that the ALJ conducted regarding Mr. Dornan's symptoms.

Evaluating an individual's subjective symptoms is a two-step process. SSR 16-3p, 2017 WL 5180304, at *3. First, the ALJ must consider whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id.* Then, the ALJ must evaluate the intensity and persistence of the individual's symptoms and determine the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second step, the ALJ may consider evidence directly from the claimant, or gleaned from other medical and non-medical sources (such as family and friends). *Id*.

An ALJ must consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including the daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020). The ALJ must also determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id.* An ALJ is not required to accept a claimant's subjective complaints, *Jones v. Comm'r of Soc. Sec.*, 336 F. 3d 469, 476 (6th Cir. 2003), and need not "make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts." *Kornecky v. Comm'r of Soc. Sec.*, 167

23

F. App'x 496, 508 (6th Cir. 2006). But the regulations require the ALJ to evaluate a claimant's symptoms, and the explanation must be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007); *see also* SSR 16-3p, 2017 WL 5180304, at *10.

The ALJ does not need to use any "magic words," so long as it clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617-JDG, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021). The ALJ's evaluation of subjective evidence receives great deference from a reviewing court. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). Absent compelling reason, a court may not disturb the ALJ's analysis of the claimant's subjective complaints, and the conclusions drawn from it. *Id*. (internal quotations and citations omitted).

Here, a review of the ALJ's decision reveals that the ALJ considered the entire record, based her findings on multiple relevant factors, and provided "specific reasons for the weight given to the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10. For example, the ALJ discussed objective medical evidence regarding Mr. Dornan's mental conditions, which did not support additional limitations. *See* 20 C.F.R. § 404.1529(c)(2); SSR 16-3p, 2017 WL 5180304, at *5 ("[O]bjective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms…"). Significantly, the ALJ noted that despite Mr. Dornan's irregular course of treatment, the mental status examinations included in the record have "consistently, albeit not universally, reported either mildly adverse, or benign findings." (Tr. 25.) Indeed, the ALJ highlighted several visits that supported this point. The examination findings demonstrated some ongoing mood anxiety and symptoms, as well as alcohol use disorder and

Xanax abuse that resulted in abnormal mood and effect occasionally. (Tr. 25.) Notably, however, Mr. Dornan also presented with appropriate dress and hygiene, good eye contact, cooperative and polite behavior, linear and goal-directed thought processes, normal speech, intact memory, fair to intact attention and concentration, intact comprehension, a fair fund of knowledge, and no suicidal ideation. (Tr. 25; *see* Tr. 344, 364-65, 443.)[4]

And reading the ALJ's decision as a whole and with common sense, the ALJ connected several findings to more specific subjective symptoms allegations when assessing the severity of Mr. Dornan's mental health limitations. For example, with respect to Mr. Dornan's allegations that he feels easily agitated and less social than in the past, the ALJ addressed this when assessing his limitation in interacting with others. In finding that his limitation was moderate, the ALJ noted that Mr. Dornan had a legal history that was significant only for alcohol-related moving violations; was able to function in public settings such as restaurants, coffee shops, and church; had friends; described having friends and socializing by going to a swimming pool; was regularly described in his treatment notes in "pro-social" terms, such as cooperative, polite, good eye contact, and interactive; and explicitly denied difficulties with those in authority or having ever lost a job due to interpersonal difficulties. (Tr. 23, 27; *see* Tr. 289-90, 341, 344, 348, 356, 364, 443.)

The ALJ also addressed Mr. Dornan's allegations of problems understanding, remembering, or applying information earlier in the decision. (Tr. 23.) In finding that Mr. Dornan had no limitation in this domain, the ALJ observed that Mr. Dornan earned an associate degree without receipt of special education services; had no perceivable difficulties in understanding or coherency in the field office interview; and was noted to have no deficits of comprehension, fair

---

[4] Although not cited by the ALJ, independent review of the record reveals other examination findings that further supports the ALJ's point. (*See, e.g.* Tr. 348-49, 351, 353, 355-56, 397-98, 444.)

to adequate fund of knowledge, and intact memory. (Tr. 23; *see* Tr. 271, 274, 343-44, 357, 365, 396, 443-44.)

Lastly, the ALJ addressed Mr. Dornan's allegation of poor reaction to stressors and change when assessing Mr. Dornan's ability to adapt or manage himself. (Tr. 23.) But the ALJ noted that the record reflected that he fair to normal insight and judgment. (Tr. 23, 27; *see* Tr. 344, 357, 364, 397-98). The ALJ further observed that Mr. Dornan's mental status examinations remained stable, despite changes and stressors including the "maintenance of subterfuge, in combination with his mother, to make his stepfather believe he is working;" the discovery of his alcoholism and need for inpatient detoxification; and the discovery that he would no longer be prescribed benzodiazepines. (Tr. 23, 26; *see* Tr. 341, 344, 363, 36; *c.f.* Tr. 443.) Considering the ALJ's decision as a whole, the ALJ more than adequately demonstrated with objective findings why Mr. Dornan's alleged symptoms were not consistent with the record.

The ALJ also discussed the medications that Mr. Dornan took to alleviate his alleged symptoms and those medications' side effects. 20 C.F.R. § 404.1529(c)(3)(iv) (ALJ may consider the "type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [his] pain or other symptoms.") Specifically, the ALJ discussed that Mr. Dornan had been prescribed various psychotropic medication regimens and experienced side effects at times, but also reported those side effects inconsistently. (Tr. 25; *see* Tr. 277, 292-93, 307, 324, 352, 484.) The ALJ acknowledged that Mr. Dornan's medications had little efficacy initially but had "at least partial efficacy" sufficient to render Mr. Dornan more stable recently. (Tr. 25; *see* Tr. 355, 359, 367, 388, 442.) The ALJ even noted that the efficacy of Mr. Dornan's medication regimen was complicated by his overuse of benzodiazepines. (Tr. 25; *see* Tr. 359, 367.)

The ALJ also addressed Mr. Dornan's "irregular" course of treatment. (Tr. 25); *see* 20 C.F.R. § 404.1529(c)(3)(v); SSR 16-3p, 2017 WL 5180304, at *9 ("[If] the … extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, … we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record."). The ALJ observed, for example, that Mr. Dornan had only two brief courses of counseling and no psychotherapy since February 2020, which ended when Mr. Dornan's psychiatrist refused to prescribe benzodiazepines. (Tr. 25; *see* Tr. 340-79, 509-31.)

And the ALJ's SSR 16-3p discussion did not stop there. Indeed, the ALJ also considered Mr. Dornan's daily activities—another appropriate factor an ALJ may consider. *See* 20 C.F.R. § 404.1529(c)(3)(i); SSR 16-3p, 2017 WL 5180304, at *7; *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 532 (6th Cir. 1997) ("An ALJ may also consider household and social activities engaged in by the claimant in evaluating a claimant's assertion of pain or ailments."). Specifically, the ALJ observed that Mr. Dornan reported activities were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (Tr. 26.) In reaching this conclusion, the ALJ observed that Mr. Dornan reported inconsistent activities such as maintaining an independent household, attending to his self-care, helping with household cleaning tasks, driving, shopping, caring for a pet, preparing simple meals, socializing with friends around the swimming pool, managing an e-mail account, eating in restaurants, and going for coffee occasionally. (Tr. 26; *see* Tr. 283-292, 341, 347.) Although none of these activities, considered in isolation, would warrant a finding of "not disabled," I agree with the ALJ that when considered in combination, these activities "strongly suggest that [Mr. Dornan] would be capable of engaging in the work activity contemplated by the residual functional capacity." (Tr. 26.)

27

Finally, the ALJ, in connection with her discussion of Mr. Dornan's daily activities, noted that Mr. Dornan worked on a part-time basis in 2019 and 2020. (Tr. 26); *see* 20 C.F.R. § 404.1571 ("Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did."); *see also Miller v. Comm'r of Soc. Sec.*, 524 F. App'x 191, 194 (6th Cir. 2013) ("[T]he ALJ did not err by considering [claimant's] ability to maintain part-time employment as one factor relevant to the determination of whether he was disabled.") (citing 20 C.F.R. §§ 404.1529(c)(3), 404.1571, 416.929(c)(3), 416.971). The ALJ noted that Mr. Dornan's part-time work, in combination with his other daily activities "indicate[d] that [his] daily activities have, at least at times, been ***somewhat greater than the claimant has generally reported***." (Tr. 26) (emphasis added).

As a whole, the ALJ sufficiently addressed Mr. Dornan's mental health conditions and subjective allegations. Mr. Dornan, represented by counsel, provides a broad recitation of the record that, in his interpretation, would demonstrate that his alleged symptoms were disabling. But it is not a reviewing court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Dowdell v. Comm'r of Soc. Sec.*, No. 1:22-CV-01348-JRA, 2023 WL 4708124, at *11 (N.D. Ohio June 29, 2023), *report and recommendation adopted*, 2023 WL 4706726 (N.D. Ohio July 24, 2023). Moreover, this general recitation of the record is "not only unhelpful, but also mischaracterize[s] the substantial evidence standard." *Helwagen v. Comm'r of Soc. Sec.*, No. 5:22-cv-01467, 2023 WL 3627253, at *16 (N.D. Ohio Apr. 202, 2023), *report and recommendation adopted*, 2023 WL 3726575 (N.D. Ohio May 30, 2023). "Even if evidence could support another conclusion, the decision of the [ALJ] must stand if the evidence could reasonably support the conclusion." *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). The Commissioner enjoys a "zone of choice"

within which to decide cases without risking being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d at 545 (6th Cir. 1986) (citing *Baker*, 730 F.2d at 1150).

Here, the ALJ provided sufficient, clear reasons demonstrating why the intensity, persistence, and limiting effects of Mr. Dornan's subjective symptoms were not as severe as alleged. Mr. Dornan ignores the ALJ's reasons and presents no argument demonstrating why these reasons are error. (*See* ECF No. 7, PageID#574-78.) By discussing the objective findings, the efficacy of Mr. Dornan's treatment regimen, and his activities of daily living in the context of his allegations, the ALJ built an "accurate and logical bridge" between the evidence of record and the result. *Fleischer v. Astrue*, 774 F. Supp. 2d at 877. Thus, Mr. Dornan does not establish a "compelling reason" for this reviewing court to disturb the ALJ's credibility determination. *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Accordingly, I recommend that the Court reject this assignment of error because it lacks merit.

## VI. RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

Dated: December 4, 2023

*s/ Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

## VII. NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for

such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Id. (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).